[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 6, 2009
THOMAS K. KAHN
CLERK

_____

No. 07-14367

_____

D. C. Docket No. 05-03056-CV-WSD-1

ROBERT WILLIAMS,

Plaintiff-Appellant,

versus

DEKALB COUNTY,
a political subdivision of State of Georgia,
RONALD W. JONES,
Individually,
LEWIS GRAHAM,
Individually,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(May 6, 2009)

Before TJOFLAT and CARNES, Circuit Judges, and HOOD,[*] District Judge.

PER CURIAM:

Six hours before Lewis Graham started his first day as DeKalb County Chief of Police, one of his officers saw a man loitering. That officer, Ronald Jones, put the man, Robert Williams, into his patrol car and drove him to a wooded spot in a neighboring county. There Jones beat Williams and stabbed him. When Jones realized the trouble he was going to be in, he tried to flip the facts by accusing Williams of kidnaping and assaulting him.

After Officer Jones eventually admitted the truth, Williams filed a state-court lawsuit against him, Chief Graham, and DeKalb County based on the injuries Williams had suffered. That lawsuit alleged violations of 42 U.S.C. § 1983 and of the Georgia laws against false imprisonment, kidnaping, and aggravated assault. It was later removed to the federal district court, where Williams and Graham and the County filed cross-motions for summary judgment. The district court granted the motion filed by Graham and the County after determining that the County was not liable for Williams' injuries under § 1983, that Williams' state-law claims against the County were barred by sovereign immunity, and that Williams had abandoned all his claims against Graham by failing to respond to Graham's arguments that

[*] Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

2

qualified and official immunity barred them. This is Williams' appeal from the resulting judgment in favor of Graham and the County.

## I.

## A.

In the Fall of 2004 Robert Williams sat at a DeKalb County bus stop near Wesley Chapel Road in Atlanta. While he rested there in the early morning hours, Officer Ronald Jones of the DeKalb County Police Department approached Williams and told him to move along.

Williams, who was homeless, left the bus stop and went behind a nearby Chinese food restaurant to lay down to sleep. Minutes later Officer Jones approached him a second time. Once again he asked Williams to move on. Williams told Jones that he had nowhere else to go. Jones gave Williams a choice: he could either find another place to sleep or he would find himself in jail. Williams chose jail.

After patting Williams down, Jones opened the back door of his police car and Williams climbed inside. Williams, who had been taken to jail for loitering before, noticed as they drove away that they were heading in wrong direction. When he asked where Jones was taking him, Jones told Williams that they were going to the place Jones took homeless people he found on his beat. Jones did not

3

call in his location or destination to the dispatcher even though Williams remembered that other officers had contacted dispatch during his previous loitering arrests.

Jones eventually stopped the police cruiser in a wooded part of Rockdale County. There were no street lights, and it was dark. Jones got out, walked around to the passenger side, opened the rear door, and ordered Williams out of the car. Worried for his safety, Williams refused to leave the vehicle. Jones then attempted to force Williams out by hitting him with a baton. It worked, but during the scuffle that followed outside the vehicle, Jones stabbed Williams in the arm, abdomen, and leg with a knife. He also tried to cut Williams' neck, but missed and sliced Williams' chin instead.

At some point in the fight Jones drew his gun, but Williams managed to wrestle it from him. As he ran into the surrounding woods to escape Jones, Williams threw the weapon to the ground. He stumbled in the darkness, fell into a creek, and then stripped down to his boxer shorts to keep the noise his soaked jeans were making from giving him away. Williams hid in the woods until daybreak.

In the hours between the attack and sunrise, Officer Jones told an investigator from the DeKalb Major Felony Unit that he had been kidnaped and assaulted by Williams. Because of that, Williams was arrested when he emerged

4

from the woods. Jones admitted in an interview conducted several days later that he had lied about Williams instigating the attack. Jones resigned from the police department, and the charges against Williams were dropped. He was released after having spent a day in jail.

B.

Williams filed this lawsuit in the Superior Court of Fulton County, but it was removed to federal district court. The complaint included both individual and official-capacity claims against Officer Jones and Chief Graham, but the official-capacity claims were dismissed by consent order. After the cross-motions for summary judgment, the court granted Graham and the County's motion. (The court also entered a default judgment against Jones, who had failed to appear.)

The district court divided Williams' contentions about the County's § 1983 liability into two theories. On the first theory, that "the County was negligent in hiring Jones and inadequately trained and supervised him," the court found that Williams had "not submitted evidence showing that the County's use of force training was deficient or that it did not adequately supervise officers in the application of force." The court concluded that the "facts show[ed] that the County was not deliberately indifferent to the inappropriate use of force by officers and has in place policies and practices to address and respond to claims of excessive use of

5

force, including those made against Jones." Williams had also failed, the court believed, "to identify and present evidence that a final policymaker negligently hired" Jones. The court pointed out that Jones got his job and was on the force before Graham became the Chief of Police.

Williams' second theory of § 1983 liability was that "the County allowed a policy or widespread practice to develop among police officers of removing homeless people outside of the County" which "led to the violation of [Williams'] right to be free from the excessive use of force." The district court again concluded that Williams had failed to satisfy his burden, because there was "little direct evidence, other than the belief of a few police officers, that these types of removals were actually carried out." "More importantly," the court noted, there was "no evidence, even if the removals occurred, that homeless people were harmed during or as a result of removal." Because it thought that Williams had not adequately proven a basis for holding the County liable for Jones' actions, the court granted summary judgment for it on Williams' § 1983 claim.

The district court also reasoned that Williams had abandoned his § 1983 claim against Graham by not responding to the argument that qualified immunity barred it, and on that basis the court granted summary judgment for Graham on Williams' § 1983 claim.

Because Williams also failed to respond to Graham's argument that official immunity blocked the state-law claims against him, the court deemed those claims abandoned as well. Finally, the court concluded that sovereign immunity barred Williams' state-law claims against the County. Although Williams argued that the County had waived its immunity for losses arising out of its officers' use of motor vehicles, at least up to the amount of any vehicle liability insurance the County held, the court noted that the statute granting that waiver applied only to negligent use of motor vehicles. Because Williams' complaint had alleged Jones intentionally harmed him, the statute did not waive the County's sovereign immunity in Williams' case. On those bases the court granted summary judgment for Graham and the County on the state-law claims.

## II.

Williams contends that the district court erred in granting summary judgment for DeKalb County and Chief Graham on his § 1983 claims against them. He argues his evidence created a genuine issue of material fact about whether the County violated his "fundamental constitutional right to be free from unlawful seizure and . . . brutality" because it was aware of Officer Jones' propensities for untruthfulness and violence but failed to train and supervise Jones properly to "protect the public." He also asserts that there is a genuine issue about

7

the County negligently hiring Jones, because his evidence shows the County offered Jones a job even though it knew about those propensities. Williams contends that the evidence shows that the County had a policy or custom of involuntarily relocating the homeless to neighboring jurisdictions to "clean up" DeKalb County, and he points to the testimony offered by his expert that the County's policy made the constitutional violations he suffered foreseeable.

A.

We review de novo a district court's grant of summary judgment, resolving all issues of material fact in favor of the nonmovant. McDowell v. Brown, 392 F.3d 1283, 1288 (11th Cir. 2004). Although the Supreme Court has held that counties are subject to liability under § 1983, a plaintiff cannot rely on the doctrine of respondeat superior to hold a county liable. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 692, 98 S. Ct. 2018, 2036 (1978) (finding that § 1983 "cannot be easily read to impose liability vicariously on governing bodies solely on the basis of the existence of an employer-employee relationship with a tortfeasor"); McDowell, 392 F.3d at 1289. The initial question is whether a county has a policy or custom that caused the injury. City of Canton v. Harris, 489 U.S. 378, 385, 109 S. Ct. 1197, 1203 (1989) ("It is only when the execution of the government's policy or custom . . . inflicts the injury that the municipality may be held liable."

(internal quotation marks omitted)); see also Gilmere v. City of Atlanta, 737 F.2d 894, 901–02 (11th Cir. 1984) (noting that a custom consists of those practices of city officials that are "so permanent and well settled" as to have "the force of law" (internal quotation marks omitted)). If a plaintiff establishes that a policy exists, he must then show that the policy was the "moving force behind the constitutional deprivation." Farred v. Hicks, 915 F.2d 1530, 1532–33 (11th Cir. 1990) (internal quotation marks omitted).

1.

A police department's failure to train or supervise its officers can constitute a "policy" sufficient to trigger governmental liability but only in limited circumstances, such as when that failure "amounts to deliberate indifference to the rights of persons with whom the police come into contact." City of Canton, 489 U.S. at 388, 109 S. Ct. at 1204; see also Farred, 915 F.2d at 1533. To establish deliberate indifference, "a plaintiff must present some evidence that the [county] knew of a need to train and/or supervise in a particular area and the [county] made a deliberate choice not to take any action." Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998). We have noted that "deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk;[and (3)] conduct that is more than mere negligence." McElligott v.

Foley, 182 F.3d 1248, 1255 (11th Cir. 1999) (internal quotation marks omitted). "[S]ince a finding of deliberate indifference requires a finding of the [county]'s subjective awareness of the relevant risk, a genuine issue of material fact exists only if the record contains evidence, albeit circumstantial, of such subjective awareness." Id.

The district court concluded that Williams failed to show that the County knew Jones (or other officers) needed additional training or supervision and deliberately chose not to provide it. The court noted Williams' attempt to highlight Jones' propensity for violence as a way of demonstrating the County's failure to train or supervise him adequately but found that each time Jones acted violently prior to this incident, the County had "responded appropriately and consistently" by sending Jones for counseling and additional training. Noting that the County "has in place policies and practices to address and respond to claims of excessive use of force," the court found that there was no evidence that it had been "deliberately indifferent to a need to train or to supervise officers on the use of force and the circumstances in which it is appropriate."

We agree. Williams presents essentially the same arguments to us about Jones' propensities for lying and violence as he did to the district court, and like that court we are not persuaded that the evidence creates a genuine issue of

10

material fact that the County knew it risked causing harm by failing to improve the training or supervision of its officers. See McElligott, 182 F.3d at 1255. The County investigated Jones each time it was notified that Jones may have been involved in an on-the-job violent incident, including the one that led to this lawsuit, and the County disciplined Jones when it determined that was the appropriate response to his behavior.

The first of those incidents occurred in December 2001when Jones got into an altercation while attempting to issue a noise citation. When the noise offender refused to sign the citation, Jones handcuffed him. The man resisted, and Jones knocked the man to the ground to subdue him. Jones sought out his supervisor the following day and apologized for his overreaction, explaining that he had "messed up." The supervisor accepted Jones' apology but still filled out a written report on the incident. Jones was not disciplined on that occasion because his supervisor did not believe the behavior would re-occur. The supervisor did note that Jones had been "counseled on the proper way to handle county ordinance charges and the correct manner in which to defuse these types of incidents."

About nine months later in September 2002, Jones was accused of using profanity and brandishing his firearm at a bystander whom he was questioning in response to a domestic dispute down the street. The bystander filed a complaint,

11

and the police department conducted an investigation into the incident. That investigation concluded that the evidence was insufficient to sustain the allegations. Because the investigative report noted that there had been "two additional non-sustained complaints" against Jones based on his "interaction with citizens," the department required Jones to complete a retraining course on communication and crisis intervention.

In addition to these two documented instances of inappropriate behavior, Williams offers evidence about two other ones that may have involved Jones. As to the first, Williams notes that one of Jones' fellow officers testified during his deposition for this lawsuit that Jones had assaulted an unconscious, handcuffed suspect while using racial slurs and profanity in February 2002. The officer claimed to have reported Jones' behavior to supervisors, but he could not remember to whom he had made the report.

As evidence of the second other instance of inappropriate behavior, Williams notes that in December 2003 a homeless man told Rockdale County police that a DeKalb County officer had driven him across county lines, assaulted him, and left him there. A medical examination of the man performed after the incident showed no injuries, and he could remember neither the type of car he rode in nor the officer who drove it. Nonetheless, the Rockdale County incident report

12

stated that DeKalb County Internal Affairs had been notified. Although Jones' admitted attack on Williams makes it more plausible that this similar-sounding incident involved Jones, it was not until November 9, 2004—eight days after Williams was assaulted—that the man tentatively identified Jones as his abuser.

What these four incidents show is that when the County knew about Jones' violent behavior, it responded appropriately by investigating and, when needed, disciplining Jones. Indeed, the investigation into Jones' attack on Williams not only prompted Jones to resign, but also resulted in criminal charges being filed against him. The County's response does not support a conclusion that it was deliberately indifferent to Williams' constitutional rights. See City of Canton, 489 U.S. at 388, 109 S. Ct. at 1204; Gold, 151 F.3d at 1350. The district court's conclusion that the County was not liable under § 1983 on a failure-to-train theory was not error.

2.

We also agree that the County cannot be held liable under § 1983 for negligently hiring Jones. To support a conclusion that a county's "isolated decision to hire [an officer] without adequate screening" is sufficient to subject the county to § 1983 liability, a plaintiff must demonstrate "that [the county's] decision reflected a conscious disregard for a high risk that [the officer] would use

13

excessive force in violation of [the plaintiff's] federally protected right." Bd. of County Comm'rs v. Brown, 520 U.S. 397, 415–16, 117 S. Ct. 1382, 1394 (1997). Williams did not offer enough evidence to show that the County knew about and consciously disregarded what he calls Jones' "propensity for violence."

The only incident Williams can point to in support of his argument that Jones had a propensity for violence before he was hired by the County in 2000 is a 1993 altercation in which Jones shot an invader in his home. During the process of screening Jones for work as a police officer, a psychologist hired by DeKalb County evaluated Jones' conduct in the 1993 shooting. The psychologist gave Jones a "favorable evaluation" and recommended him to the County. That is not enough evidence to meet the high burden the Supreme Court has articulated for establishing that a governmental entity's hiring decision violated a plaintiff's constitutional rights in circumstances like these. See id. at 412, 117 S. Ct. at 1392 (noting that a plaintiff must show the offending "officer was highly likely to inflict the particular injury suffered by the plaintiff" and that the "connection between the background of the particular applicant and the specific constitutional violation alleged must be strong"). We agree with the district court's conclusion that the County was not liable under § 1983 on a negligent hiring theory.

14

3.

Williams' other theory for imposing § 1983 liability on the County is that his injuries were caused by the County's policy of solving its homelessness problem by having police officers take homeless people to neighboring counties. The district court found "little direct evidence, other than the belief of a few police officers, that these types of removals were actually carried out." To the extent that the district court based its decision to grant summary judgment on this finding of "little direct evidence," it erred.

There does not have to be any direct evidence, much less more than a little of it, to present a genuine issue of material fact about whether the County had a homeless relocation policy. The district court's words give us the impression that it weighed the evidence Williams offered instead of simply drawing a threshold admissibility line. While district courts must resolve admissibility-of-evidence questions, they are not permitted to weigh evidence. See, e.g., Ballou v. Henri Studios, Inc., 656 F.2d 1147, 1154–55 (5th Cir. 1981).[1] That is the jury's job.

Williams offered testimony from at least five members of the DeKalb County Police Department who had some knowledge of a homeless relocation

---

[1] In our en banc decision Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981), we adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

15

policy. One officer testified that he had heard of the practice while he was still in the police academy. Another officer noted that he had heard from his superiors that officers needed to take homeless citizens "somewhere" if officers could not think of a reason to arrest them. A third officer stated that it was "common knowledge" that supervisors encouraged officers to relocate the homeless. A fourth officer admitted that officers actually did relocate the homeless. Finally, a supervisory officer testified that relocation was "done all the time" and had been going on for twenty years.

Despite the fact that none of the officers could name any specific officer who had relocated a homeless person, and none of the five admitted to having done it himself, we think their testimony is enough from which a jury could find that the County had a policy of involuntarily relocating homeless citizens. While the circumstantial nature of the officers' testimony may lead a jury to conclude that Williams has not sufficiently proved a policy existed, that is the jury's decision to make.

Of course, that Williams has offered enough evidence of a homeless relocation policy to survive a motion for summary judgment is not the end of the matter. Williams must also show that the policy was the "moving force" behind his injuries. <u>Cuesta v. Sch. Bd. of Miami-Dade County</u>, 285 F.3d 962, 967 (11th

Cir. 2002) ("The official policy or custom must be the moving force of the constitutional violation in order to establish liability of a government body under § 1983." (internal quotation marks omitted)); see also Brown, 520 U.S. at 404, 117 S. Ct. 1388 (noting that a plaintiff "must demonstrate a direct causal link between the municipal action and the deprivation of federal rights"); Farred, 915 F.2d at 1532–33.

The district court concluded that Williams had offered "no evidence, even if the removals occurred, that homeless people were harmed during or as a result of removal." The undisputed facts about what happened to Williams proves that conclusion untrue. At least one homeless person was harmed as a result of his removal from DeKalb County.

In addition to the evidence about what happened to him, Williams presented an expert in police policy and procedure who testified in deposition that a homeless relocation policy would make constitutional violations like the ones Williams sustained "very definitely foreseeable." The expert's report also concluded that "[m]ore likely than not, if the custom and practice of DeKalb County of taking homeless and other undesirables and transporting them over the county line to other jurisdictions did not exist, the false arrest and injuries sustained by Mr. Williams would not have occurred." We cannot agree with the district court's

conclusion that there was "no evidence" that homeless people were harmed as a result of the alleged relocation policy.

Williams' own injuries and his expert's opinion may not be overwhelming evidence that the alleged policy was the "moving force" behind the violation of his constitutional rights, but they are sufficient evidence of a "causal link" between the policy and the injuries to get the case to a jury. See Brown, 520 U.S. at 404, 117 S. Ct. 1388; Cuesta, 285 F.3d at 967; Lowe v. Aldridge, 958 F.2d 1565, 1569 (11th Cir. 1992).

We note that the district court does not appear to have based its decision to grant summary judgment regarding the causal connection element on a theory that the expert testimony was due to be excluded under Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579, 114 S. Ct. 2786 (1993). See also id. at 592–93, 113 S. Ct. at 2796 (noting that the district court must conduct a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue" before deciding expert admissibility questions); City of Tuscaloosa v. Harcos Chems., Inc., 158 F.3d 548, 564 n.21 (11th Cir. 1998). We will not supply a reason that neither the district court nor the County has suggested. We do not imply any view on whether it would have been

18

an abuse of discretion for the district court to have excluded the testimony of Williams' expert on <u>Daubert</u> grounds, nor any view on whether there would have been sufficient evidence of a causal link without that testimony. Instead, we decide only the issues that have been brought to us. As to the grant of summary judgment to the County on the claim that it had a policy of dealing with the homeless in a way that violated their rights and led to Williams' injuries, the judgment of the district court cannot stand on the record before us.

B.

Chief Graham contends, as he did before the district court, that qualified immunity bars the § 1983 claim against him. Williams fails to address that contention, just as he failed to address it in the district court. We, like the district court before us, consider Williams' § 1983 claim against Graham to be abandoned. <u>See, e.g.</u>, <u>Solantic, LLC v. City of Neptune Beach</u>, 410 F.3d 1250, 1256 n.6 (11th Cir. 2005). We also reiterate that Graham did not even assume his role as Chief of Police until several hours after this incident occurred. This claim is frivolous.

**III.**

On the state law claims, Williams renews the argument that he made his district-court argument that the County waived its sovereign immunity by purchasing auto insurance to cover negligent acts of its agents arising out of the

19

use of motor vehicles. See Ga. Code Ann. § 33-24-51(b) ("The sovereign immunity of local government entities for a loss arising out of claims for the negligent use of a covered motor vehicle is waived . . . [w]henever a municipal corporation, a county, or any other political subdivision of this state shall purchase [] insurance . . . to provide liability coverage for the negligence of any duly authorized officer, agent, servant, attorney, or employee in the performance of his or her official duties . . . . [I]ts governmental immunity shall be waived to the extent of the amount of insurance so purchased."). He asserts that Jones' actions involved the use of a "covered motor vehicle" because Jones drove Williams in a patrol car to the place where the assault occurred.

Even if we were to accept this theory, however, Williams' argument still fails. It is clear from the statutory text that the waiver is meant to encompass negligent acts, not intentional ones. As the district court noted, Williams' complaint alleged that Jones acted intentionally. We agree with the district court that Georgia Code § 33-24-51(b) does not waive the County's sovereign immunity.

Williams offers no argument about whether his state-law claims against Chief Graham are barred by official immunity, as Graham contends they are. We, like the district court, consider those claims abandoned. See Solantic, 410 F.3d at 1256 n.6.

20

## IV.

In conclusion, we AFFIRM the judgment of the district court in all respects, except that insofar as it concerns the claim against the County on the theory that its policy of dealing with the homeless caused Williams' injuries we REVERSE the judgment and REMAND for further proceedings consistent with this opinion.

**AFFIRMED in part, REVERSED and REMANDED in part.**